## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 20 2020, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Stephen E. Reynolds
Sean T. Dewey
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil Commitment of M.S.,

*Appellant-Respondent,*

v.

Community Health Network, Inc.,

*Appellee-Petitioner.*

November 20, 2020

Court of Appeals Case No.
20A-MH-508

Appeal from the Marion Superior Court

The Honorable Steven R. Eichholtz, Judge
The Honorable Melanie Kendrick, Magistrate

Trial Court Cause No.
49D08-2001-MH-4455

**Baker, Senior Judge.**

# Statement of the Case

[1] Appellant M.S. appeals the trial court's order of temporary involuntary commitment. We affirm.

# Issue

[2] M.S. presents one issue for our review, which we restate as: whether the trial court's order of temporary involuntary commitment is supported by sufficient evidence.

# Facts and Procedural History

[3] On January 24, 2020, sixty-five-year-old M.S. was admitted into a hospital in the Community Health Network ("Hospital"). The circumstances surrounding M.S.'s admission are that she was living in her car, and, because the weather was cold, she was running her car to stay warm. She eventually ran out of gas and contacted one of her brothers for gas money. When her brother refused to give her money, M.S. threatened to burn down his house. M.S.'s brother then contacted the police, who found her living in her car in unsanitary conditions and exhibiting delusional and psychotic behavior. M.S. was taken to the hospital where she was evaluated and determined to be suffering from schizophrenia.

[4] Based upon this evaluation, hospital staff filed an application for the emergency detention of M.S. In the application it was alleged that M.S. was suffering from a psychiatric disorder and was both gravely disabled and dangerous to others.

The application specified that M.S. was "paranoid and delusional, threatening to kill her brother and Evan Bayh with a gun or baseball bat" and believing that everyone around her is "Satanists who are trying to steal [her] intellectual property." Appellant's App. Vol. II, p. 13.

A few days later, Dr. Jacob Mulinix, on behalf of the Hospital, filed a Report Following Emergency Detention, requesting the trial court to order a temporary involuntary commitment of M.S. Dr. Mulinix indicated that M.S. was suffering from schizophrenia and was gravely disabled. More specifically, Dr. Mulinix reported that M.S. was living in her car, which had feces throughout it, that she had no insight into her illness, and that she had refused to begin voluntary treatment.

On February 3, the court held a commitment hearing. Dr. Gaimur Mian and M.S.'s two older brothers, R.S. and W.S., testified in support of her temporary commitment. Dr. Mian, a psychiatrist, testified that he had examined M.S. ten times since she had been admitted to the hospital, including on the day of the hearing, and he had diagnosed M.S. with schizophrenia. He testified that, while in the hospital, M.S. was being given the oral form of Haldol to treat her mental illness. However, M.S. was taking the medication "quite reluctantly" and only to "appease" her medical providers during her commitment. Tr. Vol. II, p. 9. Dr. Mian stated that M.S. does not believe she is ill, and therefore she does not want to take any medication and had no intention of continuing any medication once she was released.

[7] Dr. Mian further testified that although the oral medication M.S. had been taking during her hospital stay had helped her thought processes to become more logical and coherent, it had not improved her delusions. Dr. Mian stated that M.S. was "still very delusional" and "still ha[d] poor insight" into her condition in that she did not believe she has schizophrenia. *Id.* at 7. He explained that the two major fixed delusions held by M.S. involved her belief that Evan Bayh was persecuting her and that she had invented things like a five screen television and the microwave oven but that this intellectual property had been stolen from her.

[8] Dr. Mian also testified that due to her mental illness, M.S. is unable to function and meet her own needs. He agreed that M.S. suffers from a substantial impairment of her judgment, reasoning, and behavior such that she is unable to function independently and that she needs medication to treat her mental illness. Dr. Mian concluded that M.S. was gravely disabled due to her chronic mental illness.

[9] Dr. Mian further testified that a temporary commitment of M.S. was necessary in order to convince her to take her antipsychotic medications and make her accountable for doing so. In addition, the medical staff would be able to assist her with social services in order to find housing and manage her money. Dr. Mian testified that his treatment plan for M.S. included the injectable form of Haldol because it remained in a patient's system for a month and alleviated the necessity of the patient remembering to take their medication as well as avoiding the issue of patients refusing to take the medication. Dr. Mian

anticipated a one-week in-patient stay to administer the injection, monitor any effects, and allow social services to arrange for housing and other needs. He also stated that notes from a prior commitment of M.S. indicated she was given the injection of Haldol, and her mental status improved such that she could continue merely with out-patient care. Dr. Mian testified that with the temporary commitment and medication, M.S.'s prognosis would be "fair to good," but without treatment, her prognosis would be "poor." *Id.* at 13.

[10]  Next, R.S., one of M.S.'s brothers, testified. R.S. stated that M.S. calls him and their other brother, W.S., asking for money. Previously, they had given her money and paid for her car to be repaired, but recently the brothers had told M.S. that they would not give her any more money until she went back to the doctor and got back on her medication. However, when they told her that, she threatened them, stating she was going to kill them, shoot them, burn down W.S.'s house, and beat W.S. with a baseball bat.

[11]  R.S. also testified that M.S. had been living in her car for approximately two years after she was evicted from her apartment because she would not allow her apartment to be treated for bedbugs. M.S. thought they were going to try to kill her and she referred to the situation as "the Holocaust." *Id.* at 17. R.S. described the condition of M.S.'s car as "completely full . . . of all of her belongings, food, garbage" with the bumper dragging on the ground. *Id.* at 18. He testified that there were "bags of poop" in the trunk and that the car repair shop believed the car to be beyond repair and refused to take it inside their building to verify this because of the smell. *Id.*

[12] Additionally, R.S. testified that M.S. had told him that she carried Evan Bayh's children for the first six months before they were extracted from her body and placed into the body of Susan Bayh for delivery. Yet, R.S. testified that when M.S. is on her medication, she "has almost a normal life." *Id.* In the past, social services assisted her in securing an apartment, R.S. and W.S. helped with furnishings, and M.S. was able to afford the rent and utilities. In addition, R.S. testified that he bought the car for M.S. and that she was previously able to maintain it. However, R.S. stated that M.S. has a history of noncompliance with her medication and that he believed she would not take her medication without a court order.

[13] W.S., M.S.'s other brother, also testified. He described M.S. as "a completely different person," "a real sweet person, lovable person" that everyone loves being around when she is on her medication. *Id.* at 21. He also testified about another eviction in which M.S. "was screaming and hollering at the other tenants." *Id.* W.S. agreed with his brother's assessment that M.S. would not take her medication without a court order.

[14] Finally, M.S. testified on her own behalf at the commitment hearing. She began by describing her plan to get on the waiting list for an apartment where the rent is based on a sliding scale. In the meantime, she stated she was hoping to be allowed to stay at a shelter where she had previously stayed after she was evicted. Counsel then asked M.S. if she is able to take care of herself. M.S. responded:

Most definitely I am. I have so many things to address. These are the clothes that have not been washed. And I have a red sweater, it is too hot to put on. But I had it on that day. And there is no feces in my car. And if there is a smell it is manufactured by Evan Bayh's Satanism. I have known him since I was thirteen years old. I met him through my classmate at Chartrand High School, which turned into Roncalli just that following year. Danny Dryer, a mutual friend, is how I met Evan Bayh. And I have known Shelly Season – Shelly Jackson through Susan Bayh since she was in college at Ball State. Friends with her parents, Frank and Sharon Jackson, who lived on East Southport Road. She was not from California as that big spread said when he was governor. And we [rode] to some church functions together and she showed me her first apartment. There – regarding that bag, in August, there was an only [sic] feces in a bag in my trunk. I had been at Eagle Creek Park and I had to go to the bathroom and I – it was near – it was nearing closing time and I had to get out. And I did not have time to drive to the – the park restroom, get out and go in, come back and drive out. So I did go in a bag, put it in my trunk and forgot to dispose. That is the only reason why that was still in there and I did get out on time from the park. And I frequent Eagle Creek Park. I usually buy a yearly pass. And I eat healthy and I try to exercise. And my car is cluttered. Of course, I have food in my car. Now it would be garbage because I have not for over a week been in my car to discard. There was no – I keep extra cups because I go to the Valero station and wash daily. And I have this scrub, but it is gone so I do not – I cannot think – scrubber in my car and soap. And I would fix morning coffee. They have a microwave. I would microwave water and I buy my own coffee and then would make it – my own coffee.

*Id.* at 24-25.

[15] M.S. denied needing a court order to take her medication, and, when asked if there was anything else she wanted the court to know, she stated:

Yes. Evan Bayh steals money from me and steals gas from me. At the end of the month, frequently I do have to ask for money. You will have to ask him why. I think it is just because he is suffering because Evan and [ ] Susan both have stolen my intellectual property and for decades and gotten wealthy. I believe it used to be on file at my grade school, St. Mark's Catholic elementary school, all that I did, writing, movies, plays, musicals, music. And I continued it in high school at Roncalli and in college at IU and then at IUPUI, when I went back to IUPUI in the 80's until mid-90's. And I was registered – I was registered in January, begin January 13 and three courses that IUPUI could complete my degree in sociology. Having me detained has caused me that I have to drop out yet pay over $3000 for these courses. And of course, being on Social Security, that causes a problem for me. Plus, court fees that I still owe from the apartment issue. I had excellent relationships with people in that apartment. I was not yelling at them at all. I yelled at no one in that apartment.

*Id.* at 25.

[16]  On cross examination, M.S. acknowledged that she does not believe she has a mental illness. When asked about her testimony that Evan Bayh had created the odor in her car, she stated that she had "witnessed his Satanism," that he "can manufacture smells," and that he "manufactures bugs – cockroaches and bedbugs." *Id.* at 26-27. In addition, she testified that five years ago Evan Bayh told her he was a Satanist.

[17]  At the conclusion of the hearing, the trial court granted the Hospital's request for a temporary involuntary commitment of M.S., finding that she suffers from schizophrenia and is gravely disabled. The trial court ordered that M.S. should

be temporarily committed for a period not to exceed ninety days.  M.S. now appeals.[1]

# Discussion and Decision

[18]  M.S. contends the evidence was not sufficient to support the trial court's order of temporary involuntary commitment.  Civil commitment proceedings have a dual purpose:  to protect the public and to ensure the rights of the person whose liberty is at stake.  *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015).  When reviewing a challenge to the sufficiency of the evidence to support a civil commitment, we will affirm if, considering only the probative evidence and the reasonable inferences supporting it, a reasonable trier of fact could find that the necessary elements were proven by clear and convincing evidence.  *Id.*  We will not weigh the evidence or assess witness credibility.  *Id.*

[19]  The Hospital was required to prove by clear and convincing evidence that (1) M.S. is mentally ill and either dangerous or gravely disabled and (2) that commitment of M.S. is appropriate.  *See* Ind. Code § 12-26-2-5(e) (2007).  Clear and convincing evidence requires proof that the existence of a fact is highly

---

[1] M.S.'s ninety-day temporary commitment has expired, and therefore, the issue is moot.  However, the issue is one of great public importance that is likely to recur.  Accordingly, we will address the issue on its merits. *See M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005), *trans. denied*.

probable. *Matter of Commitment of C.N.*, 116 N.E.3d 544, 547 (Ind. Ct. App. 2019).

[20] M.S. does not challenge the trial court's finding that she is mentally ill but argues that the Hospital failed to prove by clear and convincing evidence that she is gravely disabled. "Gravely disabled" means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Ind. Code § 12-7-2-96 (1992). The trial court found that M.S. is gravely disabled, but it did not specify whether that finding was based on her inability to provide for her basic needs or her inability to function independently. As this Court has noted, because this statute is written in the disjunctive, a trial court's finding of grave disability survives if we find that there was sufficient evidence to prove either that the individual is unable to provide for her basic needs or that her judgment, reasoning, or behavior is so impaired or deteriorated that it results in her inability to function independently. *See Civ. Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Mental Health*, 23 N.E.3d 29, 34 (Ind. Ct. App. 2014), *trans. denied* (2015). Nevertheless, we discuss both factors here in order to address all of M.S.'s concerns.

[21]     First, M.S. asserts that the Hospital has not shown by clear and convincing evidence that she was in danger of coming to harm from living in her vehicle. Additionally, she points to her monthly disability benefits and her stated plans to rent an apartment and/or stay in a shelter and claims there is no evidence to suggest she would not be able to live in an apartment.

[22]     At the commitment hearing, the evidence showed that M.S. had been living in her car for two years and that it was full of her belongings, food, and garbage. At the time M.S. was taken to the hospital in January, she had been running the car for heat, had run out of gas, and had asked her brothers for gas money. M.S.'s brother, R.S., testified that the car's bumper was dragging on the ground and the car was believed to be beyond repair but the car repair shop was unable to verify this due to the odor.

[23]     Dr. Mian testified that, due to her mental illness, M.S. is unable to meet her own needs and that she had been "[l]iving in her car in the cold with no resources and really poor hygiene." Tr. Vol. II, p. 7. He diagnosed M.S. with schizophrenia and stated that M.S. does not believe she is ill. Dr. Mian testified that, due to this belief, M.S. was taking medication in the hospital merely to appease the hospital staff but had no intention of continuing any medication once she was released.

[24]     Although M.S. received approximately $1200 of Social Security benefits each month, she routinely ran out of money and asked for money from her brothers. In addition, although M.S. testified that she planned to get an apartment

and/or stay in a shelter, she apparently had not done so in the past two years. Moreover, the evidence revealed that M.S. had previously had difficulty maintaining housing when she obtained it. As a result of her refusal to treat her mental illness with the proper medication, M.S. had been evicted from two different apartments. In one case she refused to let her apartment be treated for bedbugs because she thought someone was trying to kill her and in another case she was screaming at the other tenants. As a result, she was living in a parking lot in an inoperative car, which at times did not have heat. In contrast to M.S.'s current living arrangement, her brothers testified that when M.S. was on medication, she was able to live in an apartment, pay her living expenses, and maintain her car.

[25] M.S. next claims that the Hospital has not shown she is in danger of coming to harm due to her inability to function independently, even given a substantial impairment of judgment or reasoning.

[26] The evidence most favorable to the trial court's determination indicates that she suffers from "schizophrenia continuous," a chronic mental illness and has been the subject of at least two prior commitments. Tr. Vol. II, p. 8. Dr. Mian testified that the oral medication M.S. was reluctantly taking while hospitalized improved her thought processes in that she was more logical and coherent. Although the oral medication provided little improvement with M.S.'s "grandiose delusions," the records from her most recent commitment showed that the injectable form of the medication improved her mental status such that she was appropriate for out-patient follow up. *Id.* Dr. Mian further testified

that M.S.'s "judgment is completely misguided or impaired primarily by her delusions" because she "believes these delusions so much that they actually influence her life" and have caused her to be evicted from an apartment. *Id.* at 15. Dr. Mian also stated that M.S. continues to lack insight into her mental illness. Indeed, M.S. testified that she does not believe she suffers from a mental illness, denied refusing medication, and blamed the smell in her car and her lack of funds on Evan Bayh.

[27] In summary, M.S. is not able to manage her money, does not have and has not been able to maintain stable shelter, has not been able to maintain suitable hygiene, and is guided by her severe delusions which substantially impair her judgment and reasoning. Under these circumstances, we conclude the Hospital presented clear and convincing evidence that, as a result of her mental illness, M.S. is gravely disabled because she is in danger of coming to harm due to her inability to provide for her shelter and other basic needs and/or due to her inability to function independently as a result of the substantial impairment of her judgment, reasoning, and behavior. M.S.'s assertion to the contrary is merely an invitation for us to reweigh the evidence, which we cannot do. *See Civil Commitment of T.K.*, 27 N.E.3d at 273. The evidence was sufficient to support the trial court's order of temporary involuntary commitment.

## Conclusion

[28] Based on the foregoing, we conclude the Hospital presented sufficient evidence to support the trial court's order of temporary involuntary commitment.

Affirmed.

Pyle, J., and Weissmann, J., concur.